IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| In the Matter of | CIVIL NO. 12-00698 DKW-BMK |
| Anthony C., by and through his Parents, Linda C. and Lionel C., | **ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S DECEMBER 18, 2012 DECISION** |
| Plaintiffs, | |
| vs. | |
| DEPARTMENT OF EDUCATION, STATE OF HAWAII, | |
| Defendant. | |

**ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S
DECEMBER 18, 2012 DECISION**

**INTRODUCTION**

Before the Court is Plaintiffs Anthony C. ("Student"), by and through

his Parents, Linda C. ("Mother") and Lionel C. ("Father") (collectively,

"Plaintiffs") appeal, pursuant to the Individuals with Disabilities Education Act of

2004 ("IDEA"), 20 U.S.C. § 1400 *et seq*., from the Administrative Hearings

Officer's ("Hearings Officer") December 18, 2012 Findings of Fact, Conclusions

of Law, and Decision ("Decision"). On October 18, 2013, the Court heard oral

arguments on the appeal. After careful consideration of the supporting and

opposing memoranda, the administrative record, and the arguments of counsel, the December 18, 2012 Decision is AFFIRMED.

## **BACKGROUND**

Student has autism and was 16 at the time of the Due Process Hearing in 2012. Student has attended Variety School of Hawaii ("Variety"), a small private school specializing in students with autism, ADD and other learning disabilities, since the 2001-2002 school year. At the time of the Due Process Hearing, the Department of Education, State of Hawaiʻi ("DOE"), had been paying for Student's attendance at Variety for approximately 10 years. Decision at 3 ¶¶ 1, 3. Student's DOE home school at the time of the Due Process Hearing was McKinley High School.

Student has a Behavioral Support Plan ("BSP"), which was created by Student's behavioral instructional support services provider ("BISS"), Fred Yuen, who has worked with Student at Variety since 2003. Decision at 5. According to the BSP, Student can exhibit inappropriate behaviors when he wants to "[a]void non-preferred tasks," "[o]btain a preferred object/activity/conversation," "[c]ope with anxiety," "[o]btain control of a situation," or "obtain sensory input or relief." Pet. Ex. 5 (BSP) at 0050. Such behaviors include:

- Making inappropriate noises, talking to himself, making faces, tapping objects on his teeth, tapping hands and fingers with objects, and raising his arms above his head for a

> sustained period of time (up to 20 seconds or until prompted to put his arms down)
> - Asking questions continuously and talking about negative, sadistic, violent, conspiratorial and corrupt topics
> - Complaining inappropriately, whining, swearing, crying, being aggressive toward others, name calling, and sticking the middle finger
> - Informing people when he has done something wrong, blaming others or lying about what he did wrong
> - Repeatedly asking, "Am I having a good day?" when anxious and not accepting "no" for an answer
> - Repeatedly asking if his mom will be informed of any wrong doing
> - Saying, "I love you" and "Do you want a hug?" to inappropriate people or at inappropriate times
> - Gagging when overeating, and repeatedly burping

*Id.*; *see id.* at 0051 (explaining that Student can exhibit these same behaviors when he "becomes frustrated with a task, doesn't want to complete a task, wants a denied item, is anxious or overwhelmed and having an internal stimulation need"); Pet. Ex. 3 (IEP) at 010 (listing the same behaviors).

This appeal centers on Student's May 9, 2012 Individualized Education Program ("IEP"). The IEP provided Student with special education, occupational therapy, speech and language therapy, counseling, and transportation, as well as a variety of other supplementary aids and services, program modifications, and supports. *Id.* at 034–35. The Present Levels of Educational Performance ("PLEPS") section of the IEP addressed assessments of Student in reading, writing, math, and behavior and social skills. The PLEPS also addressed a

subject-by-subject review of Student's performance from recent Variety progress reports, as well as his progress in speech/language therapy, occupational therapy, and his behavior support plan.  Additionally, the PLEPS summarized the observations of Student that were conducted on different occasions by, among others, DOE Special Education Teacher and Care Coordinator Maile White, DOE Autism Consultant Teacher ("ACT") Verna Choy, DOE School Psychologist Melissa Faulkner, and DOE clinical psychologist Ronnie Sato.  *Id.* at 013–18. Finally, the PLEPS included the detailed report from Parents that was provided at the IEP meeting.  *Id.* at 019–23.

The IEP enumerated annual measurable goals and objectives for Student in the areas of reading comprehension, writing, math, oral communication, self-managing behaviors, decision making, interpersonal communication, and physical education.  *Id*. at 026–33.

In terms of Student's mainstreaming placement, the IEP established that:

> [Student] will not participate with non-disabled peers for English, Math, Social Studies, Science, and required Electives because he requires specially designed instruction in these areas that cannot be met in the general education setting even with the provisions of accommodations and modifications. Additionally, he requires 1:1 and small group services to addres[s] his behavior, communication and academic skill needs.

4

> [Student] will receive special education services in a special education setting at his home school on a DOE public school campus.

*Id.* at 036.  In a notice to Parents following the May 9, 2012 IEP meeting, the DOE summarized the IEP team's rationale for Student's special education placement within a DOE setting:

> [Student] requires a smaller classroom environment with supports and services that cannot be met in the general education class setting.  Due to delays in reading, writing, math, he is not able to participate in the general education setting for academic subjects.
>
> With supplementary aids and services and supports this IEP can be implemented on a DOE public school campus where he will have opportunities to integrate with non-disabled peers during recess, lunch, and non[-]academic school activities.  DOE public school may prepare him for the post-high school goals and current path of study to obtain a diploma.  Private separate facility does not provide [Student] with access to typically developing peers or access to the general education curriculum.

Resp. Ex. 4 (May 21, 2012 Prior Written Notice) at 0048.

On June 12, 2012, Parents sent an email to the vice-principal of McKinley High School, stating that they were not in agreement with the IEP, and thus would not be participating in the transfer meetings that the DOE had proposed

in order to discuss Student's transfer from Variety to McKinley.[1]  Resp. Ex. 8 (June 6, 2012 email) at 00474.

On June 27, 2012, Parents submitted a Request for Due Process Hearing.  Pet. Ex. 1 (Due Process Request) at 001–03.  On December 18, 2012, the Hearings Officer issued his Decision after holding a due process hearing on October 29–30, 2012.  The Hearings Officer concluded that the IEP did not deny Student a free and appropriate public education because, among other things:  the PLEPS, goals, and objectives in the IEP had sufficient baseline data, were measurable, and appropriately addressed Student's behaviors and levels; the IEP placed Student in the least restrictive environment and the DOE did not predetermine placement; and the IEP team considered the potential harmful effects in determining placement.  Decision at 15–24.

Plaintiffs' subsequent appeal of that Decision is presently before the Court.

## STANDARD OF REVIEW

### I.    IDEA Overview

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial

---

[1]Although not in the record below, DOE counsel represented in briefing and at oral argument that Student has, in fact, successfully transitioned to, and is currently attending, McKinley High School.

assistance to enable states to meet their educational needs." *Hoeft ex rel. Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)).  It ensures that "all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A).  The IDEA defines FAPE as special education and related services that—

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP.  20 U.S.C. § 1414.  The IEP is to be developed by an "IEP Team" composed of, *inter alia*, school officials, parents, teachers and other persons knowledgeable about the child.  20 U.S.C. § 1414(d)(1)(B).

"Procedural flaws in the IEP process do not always amount to the denial of a FAPE." *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th

Cir. 2009) (citations omitted).  Once a procedural violation of the IDEA is identified, the court "must determine whether that violation affected the substantive rights of the parent or child." *Id.* (citations omitted).  "[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *Id.* (alteration in original) (citations and quotation marks omitted).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education.  *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted).  Rather, school districts are required to provide only a "'basic floor of opportunity.'"  *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 201 (1982)).  The FAPE need only be "appropriately designed and implemented so as to convey [the][s]tudent with a meaningful benefit."  *Id.* at 433 (citations and quotation marks omitted).

## II.    <u>Standard of Review</u>

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C), which provides:

In any action brought under this paragraph, the court—

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that the district court give "'due weight'" to the administrative proceedings. *Capistrano*, 556 F.3d at 908 (quoting *Rowley*, 458 U.S. at 206) (some citations omitted). The district court, however, has the discretion to determine the amount of deference it will accord the administrative ruling. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (citing *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)). In reaching that determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference where said findings are "'thorough and careful.'" *Capistrano*, 556 F.3d at 908 (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).

The district court should give "substantial weight" to the hearings officer's decision when the decision "evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented." *Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466–67 (9th Cir. 1996) (citation and quotation marks omitted). Such deference is appropriate because "if the district court tried the case anew, the work of the hearing officer would not receive 'due weight,' and would be largely wasted." *Wartenberg*, 59 F.3d at 891. "[T]he ultimate determination of whether

9

an IEP was appropriate," however, "is reviewed de novo." *A.M. ex rel. Marshall v.*

*Monrovia Unified Sch. Dist.*, 627 F.3d 773, 778 (9th Cir. 2010) (citing

*Wartenberg*, 59 F.3d at 891).

A court's inquiry in reviewing IDEA administrative decisions is

twofold:

> First, has the State complied with the procedures set forth in the
> Act? And second, is the individualized educational program
> developed through the Act's procedures reasonably calculated
> to enable the child to receive educational benefits? [*Rowley*,
> 458 U.S. at 206–07] (footnotes omitted). If these requirements
> are met, the State has complied with the obligations imposed by
> Congress and the courts can require no more. *Id.* at 207.

*J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2010) (some citations

omitted).

The burden of proof in IDEA appeal proceedings is on the party

challenging the administrative ruling. *Hood v. Encinitas Union Sch. Dist.*, 486

F.3d 1099, 1103 (9th Cir. 2007) (citations omitted). The challenging party must

show, by a preponderance of the evidence, that the hearing decision should be

reversed. *J.W.*, 626 F.3d at 438 (citation omitted).

## **DISCUSSION**

Plaintiffs assert that the Hearings Officer was incorrect in concluding

that the IEP did not deny Student a FAPE. Specifically, Plaintiffs contend that the

Decision erroneously determined that: (1) Plaintiffs failed to prove that the IEP

10

lacked baseline information and had insufficient goals; (2) Plaintiffs failed to prove

that the DOE did not properly consider the least restrictive environment or that the

DOE predetermined placement; and (3) Plaintiffs failed to prove that the DOE

neglected to address the potential harmful effects of transfer to McKinley.[2]

*See* Opening Br. at 2.  The Court concludes that Plaintiffs have not satisfied their

burden of showing that the Decision should be reversed for any of the

aforementioned reasons and therefore affirms the Decision.  Each of Plaintiffs'

contentions on appeal is discussed in turn below.

## I.      The IEP Contained Baseline Information and Measurable Goals

Plaintiffs contend that the PLEPS section of the IEP fails to address

Student's actual needs and present levels, and does not include measurable goals

and objectives.  The DOE counters that the PLEPS and IEP goals were developed

using the most current information, assessments, and data available on Student and

provide an accurate and thorough description of Student's achievements, needs,

and objectives.  The Court agrees with the DOE.

An IEP is required to have, among other things:  "[a] statement of the

child's present levels of academic achievement and functional performance"; "[a]

---

[2] The DOE contends that some of Plaintiffs' arguments raised on appeal were not properly alleged in the Due Process Request.  The Due Process Request, however, alleged that the IEP did not provide baseline information and measurable goals, the DOE did not properly consider the least restrictive environment and predetermined placement, and the DOE did not consider the potential harmful effects of transfer. Pet. Ex. 1 (Due Process Request) at 001–02.  Regardless, the Court concludes (as discussed below) that Plaintiffs have failed to establish that any of these arguments warrant reversal of the Decision.

statement of measurable annual goals, including academic and functional goals";
and "[a] description of . . . [h]ow the child's progress toward meeting the annual
goals . . . will be measured . . . and . . . [w]hen periodic reports on the progress the
child is making toward meeting the annual goals . . . will be provided."  34 C.F.R.
§ 300.320(a)(1)–(3).

The Hearings Officer correctly determined that the PLEPS contain
baseline data and sufficiently state Student's present level of achievement and
performance.  Decision at 16–17.  The PLEPS adequately detail Student's present
levels of educational performance, needs, and strengths in the areas of reading,
writing, math, behavior, functional skills, and communication.  The PLEPS also
describe Student's then-recent performance and progress in the subject areas of
language arts, vocational education, community-based instruction, math, life skills,
social studies, physical education, gross motor therapy, speech/language therapy,
and occupational therapy.  Pet. Ex. 3 (IEP) at 007–13.

The Hearings Officer correctly concluded that:

[a] review of the goals and objectives in the May 9, 2012 IEP
show that they were written such that Student's progress could
be measured.  For example, the math goal seeks to have Student
understand various types of patterns and functional
relationships, and use symbolic forms to represent, model, and
analyze mathematical situations.  Student is to complete the
math related tasks with 80% accuracy 5 out of 5 times.  The
short terms objectives include translating between word
problems and equations; computations; using formulas;
working on multi-step problems; and using a calculator.  A

> language arts goal called for Student to use appropriate
> communication skills during structured and unstructured
> activities/events 5 out of 5 times with 100% accuracy.  The
> short term objectives include Student working on his
> conversational skills, initiating verbal interaction, and
> demonstrating appropriate social skills and rate of speech.

Decision at 16.  The goals and benchmarks are specific, capable of measurement

and directly relate to Student's focus areas, as identified in the PLEPS.  As a

further example, in addition to those described by the Hearings Officer, the PLEPS

delineate sixteen different reading strengths, including Student's ability to

"recognize stated and/or implied details from text" and his ability to "predict

events and outcomes."  Resp. Ex. 3 (IEP) at 007.  The IEP then establishes a

correlating annual goal to "demonstrate comprehension at his 7th–8th grade level

on 5 out of 5 passages with 75% accuracy," and lays out 2 specific interim

objectives for that annual goal.  *Id.* at 026.  These are not the vague and cryptic

goals that some courts have determined to be deficient, and that Plaintiffs argue are

present here.  *See Virginia S. v. DOE,* 2007 WL 80814, at *9 (D. Haw. Jan. 8,

2007) (discussing the difference between the specific, measurable goals in that

case—that are similar to the goals present here—in comparison to the vague,

deficient goals in *Escambia County Board of Education v. Benton*, 406 F. Supp. 2d

1248, 1271 (S.D. Ala. 2005), that plaintiffs in *Virginia S.*—and the Plaintiffs

here—relied on to support their argument).

Plaintiffs also argue that the IEP inaccurately set goals for Student which he had already mastered.  The PLEPS and goals were based on a variety of assessments and reports, and the input of the IEP team.  *See* Resp. Ex. 4 (May 21, 2012 Prior Written Notice) at 0049 (listing the evaluation procedures, tests, records, and reports that served as the basis for the IEP).  In particular, as the Hearings Officer found, the IEP team relied heavily on the input from Variety's director and the Variety progress reports to develop the goals and objectives. Decision at 17.  This reliance was appropriate and well-placed.  Indeed, it would be curious if the DOE elected not to use Variety's progress reports and input from Variety officials as an important resource for information on Student's strengths and needs, given that Student had been attending Variety exclusively for the past 10 years.  Further, the Court agrees with the Hearings Officer that Plaintiffs have not substantiated their claim that Student had mastered certain goals set forth in the IEP.  *See* Decision at 17 ("[E]ven if the annual goals in the May 9, 2012 IEP are verbatim or substantially similar in nature with that of the prior year, the evidence does not support the allegation that these goals were already mastered.").  Argument is not evidence before this Court, nor was it apparently sufficient to persuade the Hearings Officer.

The Court notes that the IEP is not completely clear as to "[w]hen periodic reports on the progress the child is making toward meeting the annual

goals . . . will be provided." 34 C.F.R. § 300.320(a)(3)(ii).  The IEP does provide,

however, that "[t]he school will conduct periodic progress moni[tor]ing of

behavior and progress in counseling, using behavior rating scales and observations

to update the present levels of performance on the IEP at least annually, not[e]

progress, and adjust services and supports as necessary."  Pet. Ex. 3 (IEP) at 035.

Regardless, to the extent that a failure to explicitly state the period in which

progress reports would be provided is a violation of the IDEA, the Court concludes

that it is a *de minimis* procedural violation that did not result in the loss of

educational opportunity or infringe on Parents' opportunity to participate in the

IEP process.

**II.    The DOE Considered, and Appropriately Employed, the Least Restrictive Environment ("LRE") Requirements and Did Not Predetermine Placement**

Plaintiffs contend that the Decision should be reversed because the

DOE predetermined placement and did not consider Parents' concerns, all in

violation of the LRE requirements.  The Court, however, agrees with the Hearings

Officer that "[Plaintiffs] have not shown that parents had no input in the

determination of placement at the home school, or that the DOE had pre-

determined Student's placement."  Decision at 19.

The education of a disabled child should take place in the least

restrictive environment.  *See* 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent

15

appropriate, children with disabilities . . . are [to be] educated with children who are not disabled . . . .").  "While every effort is to be made to place a student in the least restrictive environment, it must be the least restrictive environment which also meets the child's IEP goals." *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1468 (9th Cir. 1996).  In determining the least restrictive environment, the following four factors are considered:  "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [Student] had on the teacher and children in the regular class; and (4) the costs of mainstreaming [Student]." *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994).  Plaintiffs do not specifically challenge any of the above factors.  Instead, Plaintiffs generally contend that the DOE predetermined Student's placement in a special education setting at McKinley and gave no meaningful consideration to Parents' input to the contrary.

Plaintiffs have not established that the DOE predetermined placement.  At the IEP meeting, the IEP team discussed the benefits, impacts, and costs of placing Student in the general education setting, special education setting (and the different sub-categories of special education settings), and a combination of general and special education settings.  Resp. Ex. 4 (May 21, 2012 Prior Written Notice) at 049; Resp Ex. 3 (IEP Meeting Audio Disc 2) at 2:21:20–2:43:00.  Other

than Parents' testimony of their perceptions, there is no evidence that the DOE

predetermined placement.  To the contrary, the vice-principal testified that prior to

the IEP meeting, there had been no determination of placement (Hearing Tr. Vol. 2

at 246:16–20), a message that was conveyed repeatedly at the IEP meeting.  *See*

*e.g.* Resp. Ex. 3 (IEP Meeting Audio Disc 2) at 2:39:46 (noting that a transition

plan would be put into place "*if* [Student] was placed at a public school setting")

(emphasis added); *id*. at 2:40:00 ("*If this is the placement*, we are not planning to

bring [Student] in without a plan") (emphasis added).  Indeed, if placement had

been already determined prior to May 9, 2012, there would have been no reason

for the IEP team to discuss the various LRE placement options set forth above.

Consequently, although Plaintiffs do not argue any of the *Rachel H.*

LRE factors specifically, the Court determines that the DOE adequately considered

these factors in placing Student in the special education setting for his classes.

*See* Decision at 23–24 (explaining why the LRE factors were all properly

considered and why Student's placement was the LRE).  Parents' contention that

DOE did otherwise appears to be essentially based on their disagreement with the

IEP team's conclusion that Student should be placed at a DOE school.  However,

"[j]ust because the DOE believed (and [Student's] parents did not believe) that

[McKinley] High School could provide the services of the IEP does not indicate

17

that [Student's] placement was 'predetermined.'" *Virginia S.*, 2007 WL 80814, at *11.

Plaintiffs also have not shown that the DOE disregarded or did not investigate Parents' concerns about a possible placement in a DOE school. To the contrary, the evidence indicates that Parents were vocal in expressing their concerns regarding a transfer of Student to the DOE school, and that these concerns were addressed. Parents provided a report on the strengths and needs of Student in functional skills, behaviors and social interaction, and academics. This three-and-a-half page, detailed report was not only not ignored, but was incorporated in full into the IEP. Resp. Ex. 7 (Parents' PLEPS) at 00190–95; Resp. Ex. 3 (IEP) at 019–23.

Parents and the Variety director additionally expressed concerns at the IEP meeting about Student's behaviors and how those behaviors could interfere with his success in a larger DOE school setting. *See* Resp. Ex. 3 (IEP Meeting Audio Disc 2) at 2:33:00–2:34:15. The record indicates, however, that the DOE considered these concerns, and discussed possible ways to mitigate difficulties, while emphasizing that the specifics related to transition from Variety to McKinley would be developed as part of the transition plan. *See* Hearing Tr. Vol. 2 at 238:9–17 (testimony from McKinley's vice-principal that "[the IEP team] ha[s] to weigh—what we do as the IEP team is we have to weigh that, and we do consider

18

what mom's concerns were and what [the Variety director's] concerns were.  But

based on the information that we had, [] we felt that we could duplicate the

services that Variety provided and much more.").  Thus, Student's placement in the

IEP "simply reflects a difference of educational philosophy with the parents, not a

denial of opportunity to participate.  School districts have expertise in educational

methods that may be given appropriate weight in assessing an IEP's compliance

with the IDEA." *Virginia S.*, 2007 WL 80814, at *11 (internal quotation marks

and brackets omitted).  The Court declines to second-guess the DOE's employment

of that expertise here.

      In addition, the DOE conducted several observations of Student, just

prior to the IEP meeting, in order to collect further data on Student's behaviors.

Resp. Ex. 7 (Observation Reports) at 172–89.  In conjunction with the behavioral

observations, the DOE asked Parents two weeks before the IEP meeting to

complete a 150-item Parent Rating Scale that would provide further information on

Student's behaviors going into the IEP Meeting.  Parents, however, did not

complete the Parent Rating Scale, let alone indicate specific concerns that the IEP

team could address.  Resp. Ex. 8 (April 23, 2013 letter to Parents) at 279–85.

      Moreover, Student's placement was not immutable.  Student was

coming from Variety, where he had no exposure to nondisabled peers and thus no

inclusion opportunities.  However, the IEP team recognized that Student's

performance could change and that his IEP could be adapted accordingly.  *See* Resp. Ex. 3 (IEP) at 035 ("The school will conduct periodic progress moni[tor]ing of behavior and progress in counseling, using behavior rating scales and observations to update the present levels of performance on the IEP at least annually, not[e] progress, and adjust services and supports as necessary.").  In sum, the Court determines that the DOE did not predetermine placement, that the IEP placed Student in the least restrictive environment to meet his IEP goals, and that the DOE investigated and addressed the concerns of Parents.

## III.  <u>The DOE Addressed the Potential Harmful Effects of Placement at a DOE School</u>

Plaintiffs assert that the DOE did not consider the potential harmful effects in deciding that the LRE was at the DOE home school in a special education setting.  The DOE counters that the harmful effects of a transfer to McKinley were discussed at the IEP meeting and that the Hearings Officer was correct in concluding that "[Plaintiffs] have not shown that the DOE failed to conduct an evaluation to determine the possible harmful effect of the change in placement offered through the May 9, 2012 IEP."  Decision at 21.  The Court agrees with the DOE.

"In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs . . . ." 34 C.F.R. § 300.116(d).  In the IEP meeting, the IEP team discussed the possible

20

issues in changing Student's placement from Variety to a DOE school and, in

particular, to a large school like McKinley.  In fact, it was Parents, and the Variety

school director, who initially raised some of the possible harmful effects related to

moving to a larger campus setting in conjunction with Student's known behaviors.

*See e.g.* Resp. Ex. 3 (IEP Meeting Audio Disc 2) at 2:33:00–2:34:15 (Variety

director discussing potential difficulties with integrating into a larger campus and

general education peers); *id*. at 2:39:00-2:39:45 (discussion of how Student's

observed behaviors may manifest in a new placement at McKinley).  Plaintiffs

ignore the fact that a large part of the LRE discussion at the IEP meeting was about

weighing the benefits against the potential harmful effects (even if the term

"harmful effects" was not enumerated repeatedly), and how any potential

difficulties with placement at McKinley could be mitigated in the various settings

that the team was considering.  *See id*. at 2:37:20–2:37:48 (vice-principal

discussing mitigation of change in campus size); Hearing Tr. Vol 2 at 215:4–217:3

(explaining the discussion at the IEP meeting of how the pros and cons of various

placements were weighed).  Plaintiffs may not be pleased with *how* the IEP team

considered the potential harmful effects, but Plaintiffs' argument that those effects

were *not considered* is unavailing.

   Despite Plaintiffs' argument to the contrary, this case is nothing like

*Carrie I. v. DOE*, 869 F. Supp. 2d 1225, 1240 (D. Haw. 2012).  In *Carrie I.*, there

was no evidence that the IEP team discussed any of the student's behavioral issues—or the details of how the larger DOE home school would deal with those behaviors—prior to the decision to place the student at the DOE home school. *Id.* By contrast, in this case, Student's behavioral issues, and how they would be impacted by exposure to a large DOE campus, were discussed at length and in detail at the IEP meeting. Resp Ex. 3 (IEP Meeting Audio Disc 2) at 2:21:20–2:43:00. Thus, Plaintiffs' reliance on *Carrie I.* is misplaced.

Finally, according to Plaintiffs, DOE's decision to await development of a transition plan until after the IEP meeting indicates that the potential harmful effects of placement at McKinley were not considered at the time of the IEP meeting. This argument has no merit. As a threshold matter, a transition plan may be created (and appropriately developed) after an IEP has been completed. *Rachel L. v. DOE*, 2012 WL 4472263, at *15–16 (D. Haw. Sept. 25, 2012) (citing cases). In developing a transition plan, the IEP team would engage in a discussion of how to transition Student in order to address the potential harmful effects that had already been identified and considered at the IEP meeting. Although Plaintiffs may have misinterpreted the message, the record reflects that this is what the DOE communicated in indicating that the transition plan would address the potential harmful effects, and the Court sees nothing sinister, unusual or inappropriate about

DOE's approach.  *See* Hearing Tr. Vol. 2 at 234:10–12; Resp. Ex. 3 (IEP Meeting Audio Disc 2) at 2:40:45–2:41:24.

## CONCLUSION

The Administrative Hearings Officer's December 18, 2012 Decision is hereby AFFIRMED.

IT IS SO ORDERED.

DATED:  HONOLULU, HAWAIʻI, February 14, 2014.



Derrick K. Watson
United States District Judge

Anthony C. v. DOE; CV 12-00698 DKW-BMK; ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S DECEMBER 18, 2012 DECISION